LISA SOEDER & another[1] vs. COUNTY COMMISSIONERS OF
NANTUCKET COUNTY.

No. 01-P-821.

Nantucket. October 20, 2003. - April 6, 2004.

Present: ARMSTRONG, C.J., KAPLAN, & PORADA, JJ.

*Way, Public:* access. *Constitutional Law,* Taking of property, Eminent domain. *Due Process of Law,* Taking of property. *Eminent Domain,* Validity of taking, Damages. *Damages,* Eminent domain. *Practice, Civil,* Eminent domain proceeding.

In a civil action arising from the efforts of the defendants under the eminent domain procedure to clear a public way of a layer of vegetation and other material in order to regain the use of the way for emergency purposes, the judge properly rejected the argument of the plaintiff, a property owner whose property abutted the public way, that the way in question was a private way in which she had a one-half interest, where the plaintiff could not have acquired any interest in the way by adverse possession or otherwise [784-785]; however, the judge erred in granting summary judgment in favor of the plaintiff on the ground that she was entitled to compensation because the action of the defendants had a collateral effect on her house or lot even though that property had not been taken, where there was no act by the defendants causing any injury claimed, and where the change in traffic as a result of the clearing of the way was not an injury that was specific and peculiar to the plaintiff [785-789]; moreover, at a trial held on the measure and amount of damages to which the plaintiff was entitled, a second judge erred in awarding the plaintiff damages on a purported decline in the market value of her property due to the change in the way, where the plaintiff's evidence on this point was not sufficient to show that any decline in the market value of her property resulted solely from the difference in traffic effects traceable to the public or private nature of the abutting way [789-790].

CIVIL ACTION commenced in the Superior Court Department on April 28, 1997.

[1]Kenneth Soeder. Kenneth Soeder was added to the complaint after trial by way of an allowed motion for an amendment to conform to evidence of his joint ownership with his wife Lisa Soeder. Because the latter litigated this case, and for convenience, we refer in this opinion to the plaintiff Lisa Soeder.

An original coplaintiff, Louise Evans, who apparently had a "time sharing" interest in the Soeder premises, withdrew voluntarily as a party and was dismissed from the action.

The case was heard by *Vieri Volterra*, J., on motions for summary judgment, and a proceeding for the assessment of damages was heard by *Robert A. Barton*, J.

*Robert D. Hillman* for the defendants.

*Michael C. Fee* for the plaintiffs.

KAPLAN, J. A public way — a "Proprietors Way" in Nantucket usage, see note 2, *infra* — borders on the plaintiff Soeder's property in the village of Siasconset. The defendant County Commissioners of Nantucket County (County Commissioners) took steps under the eminent domain procedure to clear the way of a layer of vegetation and other material in order to regain the use of the way for emergency purposes. In the present action the plaintiff Lisa Soeder claimed resulting "special and peculiar" damages for alleged injury. On cross motions for summary judgment, a Superior Court judge allowed partial judgment of liability for the plaintiff. This was error, as the plaintiff, with the burden of proof, failed to present a compensable basis for her claim. The same error (and others) infected the subsequent trial for assessment of damages. We shall reverse the judgment entered after trial.

The narrative begins in 1995-1996 when the County Commissioners confronted a problem arising from their apprehension that a familiar road in Siasconset was in imminent danger of erosion by encroaching seas. In detail: Codfish Park, comprising a town beach and many adjoining residential lots, lies at the easternmost part of the village. Codfish Park Road, providing access to the Park, runs north to south the length of the Park and intersects at its southern end with Gully Road, which extends westerly to the rest of the village and beyond.

A washout of Codfish Park Road would entail a dangerous loss of passage to and from the Park area. In the County Commissioners' judgment, the most expedient solution of the anticipated crisis lay in utilizing an east to west route to the Park. Beach Street, running in a westerly direction from the Park, would provide the larger portion of such a route. It leads through a gully and over an eminence or cliff to Front Street (running north to south). A space on Front Street connects in reverse "L" form to a passage between two houses which back on Front Street and front on Broadway; these are Nos. 11 and

13 Broadway, the latter owned by the plaintiff Lisa Soeder. Broadway is a main thoroughfare.

The foregoing in outline describes a feasible consolidated route to the Park for emergency purposes. In the County Commissioners' understanding, the route would consist entirely of Proprietors Ways. But a practical difficulty obtruded. In recent years the Front Street connector and the passage to Broadway had not been in use as ways; the abutting householders had beautified them with vegetation of various kinds to artistic effect. When, therefore, it appeared that these ways would have to be cleared to respond to the emergency purpose, some abutters — the plaintiff included — were discontent, hoping for a different solution.

Counsel for the County Commissioners believed they could have resolved the difficulty by acting under G. L. c. 86, § 3. The statute, besides providing that an adjoining owner like Soeder cannot by possession or occupancy acquire a title to a public way, states that "obstructions encroaching upon such way shall, upon written notice from the county commissioners . . . be forthwith removed by the owner or occupant of adjoining land, and if not so removed said commissioners . . . may cause the same to be removed upon said adjoining land." *Ibid.* See *Henry* v. *Melrose*, 304 Mass. 205, 206 (1939) (purpose of statute is "to prevent an abutting owner from encroaching upon a public way"). The County Commissioners, however, might well think action by them by the terms of the statute would be the opposite of diplomatic. Likely for that reason, and out of a "surfeit of caution," as counsel put it, the County Commissioners turned to eminent domain as a more conventional and acceptable procedure for handling the situation.

After a "petition" of Nantucket inhabitants including many Siasconset householders (August 25, 1995), a "plan" (January 1, 1996), and a "resolution" (March 15, 1996), a public hearing occurred on April 3, 1996, at which the plaintiff (deploring any vulgarization of the ways at the east and south sides of No. 13) and many others debated the proposal, although none questioned the need for a remedy. On June 5, 1996, the County Commissioners adopted an "order of layout and taking" of a "way between 11 and 13 Broadway and on Front Street, Siasconset,"

which is "in fee simple absolute, excluding, however any inter-
est of the Proprietors of the Island of Nantucket therein," and
stating, "Any vegetation or improvements on the land above-
described are included in this Order of Taking." Some thirty
named "supposed owners or claimants" — abutters the length
of Front Street, including the plaintiff — are listed in an exhibit
to the order and each is awarded one dollar as pro tanto
compensation.

The accustomed terms of the order read clumsily as applied
to a case reflecting peculiar Nantucket land history, yet the
sense is pretty clear. What the County Commissioners want
taken is the encumbrances to the way, namely the vegetation
and other improvements. In the sense of the historic succession
as outlined in the margin,[2] the rights of the Proprietors are

[2]Land in Nantucket was early held in common undivided ownership with
the owners (Proprietors) organized in (quasi) corporate form for management
purposes. The procedures in use for conducting corporate meetings and dispos-
ing of business appear from the provincial statute of 12 Anne under the title
"An Act directing how Meetings of Proprietors of Lands lying in Common,
may be called," 12 Ann. c. 2 (1712), as modified and developed in subsequent
statutes cited in *Coffin* v. *Lawrence*, 143 Mass. 110, 112 (1886). The current
G. L. c. 179 is the evolved form of these statutes. The Proprietors in their
corporate capacity might set out and allot particular parcels to individuals for
private ownership, retaining the rest, including roads or ways and other landed
public facilities, in the communal style. In 1813 it was held in *Mitchell* v.
*Starbuck*, 10 Mass. 5, 19-20 (1813), that an owner of an undivided share
could apply to a court for partition, and large areas of the island reached
private hands, see *Hardy* v. *Jaeckle*, 371 Mass. 573, 576-577 (1976). We are
told in the present record that such a partition of land took place in Siasconset
in 1835. Over time, Proprietors (increasing in numbers with passing genera-
tions) held much diminished undivided land together with the landed public
facilities mentioned, the roads going by the name Proprietors Ways. The
process by which towns or other government entities succeeded to and gradu-
ally took over the control and management of roads and the like are hard to
follow and define. As Shaw, C.J., noted in 1833, in the case of *First Parish in
Shrewsbury* v. *Smith*, 14 Pick. 297, 301 (1833), the task was by that date
already complicated by the circumstance that "[t]here is great difficultly in ap-
plying the strict rules of common law conveyancing, to the early acts and
votes of proprietors, towns and parishes, in the colony and province of Mas-
sachusetts, without danger of producing some confusion of rights; and the fact
probably was, that towns, parishes and proprietors, often consisted so nearly
of the same individuals, that a grant or appropriation of one of these bodies to
another was little more than an appropriation by themselves in one capacity,
to the use of themselves in another; from which it probably followed, that less
attention was paid to such acts, than if they had been acts of alienation to

preserved: on the one hand, the County Commissioners derive their rights from the Proprietors and in effect are successors to them; on the other hand, there is no occasion to disturb any possible fractional residual claims of descendants of the Proprietors, who must now number in the thousands, with identities nearly unknowable.

The County Commissioners accomplished the clearance contemplated by the order and put a notice at the head of the way between 11 and 13 Broadway that it was restricted to emergency use. (Beach Street, the lower part of the consolidated route, was open to all traffic.) By the time of the argument of the appeal herein, the feared emergency evidently had not happened.[3]

A. *Summary judgment.* The plaintiff's present action, commenced in Superior Court on April 28, 1997, claims (see first amended complaint) that the order of taking of the County Commissioners had the effect of appropriating and inadequately paying (the one dollar) for land of the plaintiff (not specifically described). After the defendants' answer, the judge invited the parties to proceed by cross motions for summary judgment. The case as developed in Superior Court came largely to turn on the question, what if any interest of the plaintiff could reasonably be claimed to have been appropriated?

1. The plaintiff's first contention was that the way between 11 and 13 Broadway was a private way in which she had a one-half interest, the other half being owned by her neighbor at No. 11.[4] Had this claim been supported, the plaintiff might have a predicate for compensation under G. L. c. 79, §§ 6, 12, as a taking of part of her property by the public authority (consider-

strangers." The net present result, as observed in our text, is that preserved Proprietors Ways belong for practical purposes to public authority, and there may be some undivided interests in land held in common by the thousands, which get respectful but nonpractical recognition. See *Hardy* v. *Jaeckle, supra* at 581-582.

[3]The emergency way was, however, utilized for a short span when repairs were completed on Codfish Park Road.

[4]The way between 11 and 13 Broadway, the subject of the present action, lies on the south side of the plaintiff's house. It is some forty-two feet in length, with a breadth of 9.24 feet at the entrance on Broadway and 11.22 feet as it meets Front Street.

ing the No. 13 lot together with one-half of the supposedly private way).[5]

The motion judge properly rejected this argument. On historic grounds as commonly understood (assisted by evidence[6]), the judge treated the way as a Proprietors Way, "essentially," he said, "open to the public for decades, possibly even for centuries," and now, we add, under the control of the County Commissioners. In this view, the plaintiff could not have acquired any interest in the way by adverse possession or otherwise; rather, the surface vegetation was an encroachment upon the interest of the County Commissioners, which was dealt with expressly in the order of taking.

2. The plaintiff has abandoned her first contention. Granting that she has no interest in the way that could or need be the subject of a taking, she says she is entitled to compensation because action of the County Commissioners had a collateral effect on her house or lot although that property was not taken. The motion judge evidently considered this claim to be made under G. L. c. 82, § 24, and c. 79, § 12. Section 24 speaks of an eminent domain taking of land "for the purposes of a town way . . . which is laid out, altered or relocated" by public authority, and states that "[a]ny person sustaining damage in his property by the laying out, alteration or relocation of a town way . . . shall be entitled to recover the same under . . . [c. 79]." G. L. c. 82, § 24. Section 24 adds that "any person sustaining damage in his property by the discontinuance of a town way . . . or by specific repairs thereon" may resort to c. 79. *Ibid.* Passing to c. 79, we find the statement in § 12 which deals with measure of damage: "In determining the damages to a parcel of land injured when no part of it has been taken, regard shall be had only to such injury as is special and peculiar to such parcel . . . ." G. L. c. 79, § 12.

---

[5]The measure of damages in such partial taking is stated thus in G. L. c. 79, § 12: "and in case only part of a parcel of land is taken there shall be included damages for all injury to the part not taken caused by the taking or by the public improvement for which the taking is made; and there shall be deducted the benefit accruing to the part not taken unless it was stated in the order of taking that betterments were to be assessed."

[6]Affidavits of several of the County Commissioners said they had driven on the way and it had become obstructed only recently. A municipally installed catch basin was uncovered when the vegetation was removed.

(a) The motion judge was mistaken in supposing there was any action by the County Commissioner that qualified under these statutes. Since the way in question was always public with no action taken beyond the removal of a temporary encroachment, the facts of the present case do not fit the language of c. 82, § 24. On appeal, the County Commissioners framed the matter as an absence of "causation" — there was no action by them causing any injury claimed. The point has long been understood: when the city of Beverly made a layout regarding Ober Street in 1775, the selectmen said in their taking, "[w]hereas said way has been emproved time out of mind without molestation till of late we award no damages to any person." *Puffer* v. *Beverly,* 345 Mass. 396, 398 (1963).

(b) When the clearance of the encumbrance took place, the fresh appearance of the way — and the publicity raised during the public hearing process — attracted some nonemergency traffic (in unquantified amount). It is not made clear why the plaintiff, if disturbed by any excess of this intrusion, did not go to local police or the County Commissioners to interest them in conforming the traffic to the posted notice. The motion judge, however, seems to have conceived that the plaintiff deserved compensation for the change from no traffic to some traffic. This could find no support in c. 82, § 24, hence not in c. 79, § 12. But whatever the judge's reasoning, it is confounded by the proposition that official changes in traffic patterns, whether from no traffic to traffic in respect to residential abutters, or traffic to no traffic in relation to commercial abutters, are considered variable conditions of everyday life shared by all, and engender no liability of the public authority toward the abutters. The term "special and peculiar" of c. 79, § 12, is applied quite restrictively.[7] The cases arising most frequently in litigation are those involving discontinuances of roads as they diminish traffic to business abutters, and the results are expected to be null for

---

[7] The words "special and peculiar" refer to "unique injuries that differ from those 'of the general public' " and are " 'palpable' and 'direct,' rather than 'remote and consequential.' " *Burlington* v. *Bedford,* 417 Mass. 161, 166 (1994) (citations omitted). Injury is not "special and peculiar" when it is "the same in kind as that of the general public, although it may be relatively great in degree." *Malone* v. *Commonwealth,* 378 Mass. 74, 79 (1979), quoting from *Tassinari* v. *Massachusetts Turnpike Authy.,* 347 Mass. 222, 225 (1964).

the business plaintiffs (despite the statement seemingly favorable to them in c. 82, § 24). Similar results should hold for residential plaintiffs suing for their being exposed to new unwanted traffic.

The policy involved is more than a century old and is thus expressed by Knowlton, J., in *Hammond* v. *County Commrs. of Worcester*, 154 Mass. 509, 510-511 (1891):

> "It often happens that some persons are so situated as to derive a very great benefit from a public improvement, while they enjoy and use it no differently from all of the public who use it at all, but they are not for that reason specially taxed for the cost of it; so, too, they may suffer greatly from the abolition or discontinuance of it by the public authorities; but if their suffering does not differ in kind from that of the public generally, they are not entitled to compensation in damages.

> "The tribunals which lay out and discontinue highways are required by the statutes to adjudicate upon the question what is for the public necessity and convenience; and what is convenient and advantageous to one part of the public may be detrimental to another. In whatever way one may be affected as one of the public by proceedings in regard to highways, he can neither be compelled to pay specially for benefits, nor permitted to receive compensation for damages. This rule, in its application to all the people for a long period of time, generally works substantial justice, although there may be under it cases of hardship. If the public, or any part of it, are injuriously affected by erroneous action of county commissioners in laying out or discontinuing a way, their remedy must be sought through the Attorney General."

So also Holmes, J., wrote in *Stanwood* v. *Malden*, 157 Mass. 17, 18 (1892):

> "It would have been intelligible for the Legislature to say that, when a benefit is conferred upon a landowner, the value of which he does not pay for, he takes it upon the implied condition that he shall not be paid for it when it is taken away."

Were the policy to be abandoned, and recoveries permitted,

the toll on government could be so heavy (note the thirty or so possible beneficiaries in the present case) as unwisely to discourage the making of public improvements from the beginning.

A review of the cases in 1979 in *Malone* v. *Commonwealth,* 378 Mass. 74, 79-80 & n.8 (1979), showed the policy to be in full force, and there was an application of it recently in *Kiernan* v. *Salem,* 58 Mass. App. Ct. 181, 185-186 (2003)[8]; see *Paul's Lobster, Inc.* v. *Commonwealth,* 53 Mass. App. Ct. 227, 233-236 (2001). As to cognate cases of the reduction or cutting off of access to a given location, the court in *Nylander* v. *Potter,* 423 Mass. 158, 163 n.10 (1996), said flatly, for a claim to be asserted, a parcel must be "rendered landlocked."

Besides calling the new traffic alongside her house unaesthetic and uncomfortable, the plaintiff says this traffic rattled the foundation and structure of her old house and would require expensive repair. There are cases where the public authority is made to pay for damage to property caused directly and immediately by the very installation of a public improvement; this may be called "special and peculiar." See *Webster Thomas Co.* v. *Commonwealth,* 336 Mass. 130, 138-139 (1957) (installation of improvement involved tearing down building, which exposed interior walls of plaintiff's adjacent building, with heavy ensuing damage); *Holbrook* v. *Massachusetts Turnpike Authy.,* 338 Mass. 218, 223 (1958) (installation of public project caused water to be discharged onto plaintiff's land). It is another matter where such injury to property as occurs is not the result of the installation (here the removal of the vegetation) but the mediate result of an increase of traffic that is not compensable. In the present case there is the further factor that the plaintiff is chargeable with knowledge that her property is adjacent to a public way which could be restored to use at any time; so precautions about uneasy foundations might well be taken before the event.[9]

The plaintiff could not sustain her burden of proof. The mo-

---

[8]The *Malone* and *Kiernan* cases also discuss the early authorities.

[9]If perchance contrary to our position, it could be held that the plaintiff was entitled to a trial to ascertain damages for an injury to the foundation or the like, we mention that the plaintiff offered evidence on this point at trial, but the trial judge excluded it, see *infra*; the plaintiff does not make any point of this exclusion on the present appeal.

tion judge erred in allowing her a partial judgment of liability with remission to trial to determine damages; he should have denied her motion for summary judgment and allowed the defendants' cross motion and dismissed the action. See *Kourou-vacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991).

B. *Trial.* The judge who ruled on the cross motions denied the defendants' request that he report the case to our court, and the action went forward to trial upon the issue, as the judge put it, of the "measure of and the amount of damages."

1. The plaintiff had filed a pretrial memorandum and then sought to amend the memorandum by proposing three expert witnesses who would testify to any structural injury to the plaintiff's house and to the cost of repairs. A judge (the second) denied the amendment, saying it introduced "a new term of damages not otherwise included in pretrial memorandum." The plaintiff asked the trial judge (the third) to reconsider the denial, but he declined to revisit the matter. Accordingly, the question of the supposed impairment of the structure passed out of the action. The plaintiff makes no point of these rulings on the present appeal (see note 9, *supra*).

2. The plaintiff pitched her case at the jury-waived trial on the basis that the conversion of the way from private to public (as she chose to put it) caused a decline in the market value of her property. To support her proposition the plaintiff took the stand to testify to the idyllic condition of the way while the vegetation subsisted and to the effects of the traffic (in unspecific volume) that followed the clearance of the way. In his turn, the plaintiff's expert, a real estate appraiser, attempted to estimate in dollars the difference in value between the two conditions.

The defendant County Commissioners objected to the basis on which the testimony was being offered, here renewing the position they elaborated in pressing for summary judgment, that the way was and remained a public way, with the clearance simply the lawful, noncompensable removal of the plaintiff's obstruction. At all events, the defendants have contended, if the accretion of traffic could figure as a change of condition, this could not count as compensable "special and peculiar" damages.

3. If the basis of the plaintiff's case were accepted,[10] the line her expert pursued was still infirm and objectionable. The expert worked from four angles with the sales prices of properties abutting respectively on private and public ways (methods denominated in the record "average sales price" analysis, "similar property sales," "paired sales," and "best comparable"). Sundry "adjustments" had to be made along the line to try to bring the data to bear more closely upon the case at hand. Intending no disparagement of the expert's work, we can say that despite the adjustments, one can hardly accept that the differences in prices resulted solely from differences in traffic effects traceable to the public or private nature of abutting ways. On the other hand, no attention was paid to important particulars of the plaintiff's situation, e.g., that the cleared way is intended to be restricted to emergency use. Finally, the trial judge awarded $200,000 under the heading "special and peculiar" damages, which should have signaled null compensation. A decision should have passed for the defendants.

The judgment for the plaintiff appealed from is reversed, and judgment will enter for the defendants.

*So ordered.*

---

[10]The expert testified frankly, that if the way in question had always been public, "[t]hat would mean effectively there was no taking, and there would be nothing to talk about."