NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

14-P-607                                          Appeals Court

NAVY YARD FOUR ASSOCIATES, LLC  vs.  DEPARTMENT OF ENVIRONMENTAL
PROTECTION & another.[1]


No. 14-P-607.

Suffolk.     April 2, 2015. - September 4, 2015.

Present:  Kafker, C.J., Kantrowitz, & Hanlon, JJ.



Harbors.  Real Property, Harbors, Restrictions, Littoral
    property, License.  Trust, Public trust.  License.
    Department of Environmental Protection.  Administrative
    Law, Agency's authority, Regulations, Agency's
    interpretation of statute, Agency's interpretation of
    regulation.  Regulation.  Statute, Construction.  Words,
    "Tidelands."


    Civil action commenced in the Superior Court Department on
December 20, 2011.

    The case was heard by Peter M. Lauriat, J., on motions for
judgment on the pleadings and for partial summary judgment.


    Donald R. Pinto, Jr., for the plaintiff.
    Seth Schofield, Assistant Attorney General, for Department
of Environmental Protection.
    John A. Pike, for Conservation Law Foundation, amicus
curiae, submitted a brief.

---

    [1] Commonwealth.  We acknowledge the amicus curiae brief
filed by the Conservation Law Foundation.

KAFKER, C.J.  This appeal arises from a dispute over public accommodation requirements imposed within a waterways license issued by the Department of Environmental Protection (DEP) pursuant to G. L. c. 91 for property currently owned by the plaintiff, Navy Yard Four Associates, LLC (NYF).  The property is an approximately 2.6-acre parcel of land in Charlestown abutting Boston Harbor.  It is the site of a 224-unit apartment building development known as Harborview.  DEP concluded in 2004 that the project was a nonwater-dependent use sited on filled "Commonwealth [t]idelands" and therefore special conditions were included as part of its waterways license to ensure that the project served a "proper public purpose."  One of these special conditions was that seventy-five percent of the ground floor of the building be reserved for facilities of public accommodation. In 2009, NYF sought to amend its license, particularly the public accommodation requirements, contending that (1) G. L. c. 91 limits "Commonwealth tidelands" to submerged lands and excludes the tidal flats on which this project is sited, and (2) "Commonwealth tidelands" do not include property owned by the Boston Redevelopment Authority, which owned the property at the time of permitting, or other such political subdivisions or quasi public agencies of the Commonwealth.  DEP declined to grant the amendment, and NYF appealed DEP's decision to the Superior Court in accordance with G. L. c. 30A, § 14, naming

both DEP and the Commonwealth as defendants. The Superior Court affirmed DEP's denial of NYF's requested c. 91 license amendment and rejected NYF's request for a declaratory judgment invalidating DEP's relevant regulations defining "Commonwealth [t]idelands." Based on the property's history, the applicable statutory and regulatory framework, and the public trust doctrine, we reach the same conclusions and therefore affirm the Superior Court amended judgment before us.

1. Background. From 1800 to 1979, NYF's property was part of a larger parcel owned by the Federal government, originally purchased to establish the Charlestown Navy Yard. See St. 1800, c. 26 (May session). To that end, the United States government lawfully filled and constructed piers and buildings on the subject tidelands. After the closure of the shipyard, the Massachusetts Legislature, on July 22, 1978, passed a special Act (the Navy Yard Act) to facilitate the transfer of Navy Yard land to, in part, the Boston Redevelopment Authority (BRA). St. 1978, c. 556. The Federal government deeded a portion of the land, including what became NYF's property, to the BRA in May of 1979. Since that period, the BRA has redeveloped the area for multiple uses under licenses issued pursuant to c. 91,

including marinas, condominiums, offices, and water transportation facilities.[2]

In March, 2003, LDA Acquisition, LLC (LDA), submitted a waterways license application for the property to DEP pursuant to G. L. c. 91 and its implementing regulations at 310 Code Mass. Regs. §§ 9.01 et seq. (Waterways Regulations). At that time, the BRA still owned the property and LDA was its lessee. LDA's license application sought approval to build the Harborview project, as described above. On February 18, 2004, DEP issued its written determination on LDA's license application, wherein it approved LDA's proposed Harborview project. It determined the property to fall on "Commonwealth [t]idelands" as "the site is owned by the [BRA], a public agency." It also determined that the project, as conditioned, complied with all applicable standards of the Waterways Regulations, including the special standards for nonwater-dependent use projects.

In January, 2005, Navy Yard Four Associates Limited Partnership notified DEP that it had taken over the project. On May 26, 2005, the BRA conveyed the property to Navy Yard Four Associates Limited Partnership. Thus, the waterways license issued on June 11, 2005, to Navy Yard Four Associates Limited

---

[2] Currently, the United States Constitution, the oldest commissioned United States naval vessel, is docked at the former Charlestown Navy Yard.

Partnership rather than to LDA. In October, 2005, Navy Yard Four Associates Limited Partnership then conveyed the property to NYF, the plaintiff, for nominal consideration.[3]

In addition to approving NYF's plans to construct Harborview, the DEP license requires in pertinent part that "at least seventy-five percent of the ground floor of the building be maintained as Facilities of Public Accommodation [FPAs] as defined at 310 [Code Mass. Regs. §] 9.02, including interior public pathways, public restrooms, and pathways within the footprint of the building but open to the exterior."[4] This requirement stems from 310 Code Mass. Regs. § 9.53 (2000),[5] which requires FPAs for all "nonwater-dependent use project[s] that include[] fill or structures on Commonwealth tidelands."[6]

---

[3] The record demonstrates that NYF and Navy Yard Four Associates Limited Partnership are one and the same.

[4] The Waterways Regulations define an FPA in part as "a facility at which goods or services are made available directly to the transient public on a regular basis, or at which advantages of use are otherwise open on essentially equal terms to the public at large (e.g., patrons of a public restaurant, visitors to an aquarium or museum), rather than restricted to a relatively limited group of specified individuals (e.g., members of a private club, owners of a condominium building)." 310 Code Mass. Regs. § 9.02 (2000).

[5] Throughout this opinion, our citation to any section of the Waterways Regulations is to the applicable version in effect at the time of the relevant DEP determination (i.e., the original licensing or the proposed license amendment).

[6] The amount of FPA space "shall be at least equal in amount to the square footage of all Commonwealth tidelands on the

Between 2005 and 2007, NYF constructed Harborview, and as required by NYF's license, the ground floor of the Harborview building includes 32,225 square feet dedicated to FPAs. Beginning in 2006, NYF and its predecessors actively marketed the FPA space, but by late 2009 NYF had yet to find appropriate tenants.

In 2006, the Office of Coastal Zone Management and DEP completed the "Massachusetts Chapter 91 Mapping Project," which established the presumptive historic high and low water marks along the Massachusetts shore for purposes of DEP's jurisdiction under c. 91. With the new information provided by the mapping project, it became clear that the entire footprint of the building lies between the historic high water mark and the historic low water mark.[7]

_____

project site within the footprint of buildings containing nonwater-dependent facilities of private tenancy," 310 Code Mass. Regs. § 9.53(2)(c)1 (2000), though space may also be provided for utility and access facilities that must be located on the ground floor in order to serve facilities of private tenancy located on other floors, provided that these "[u]pper [f]loor [a]ccessory [s]ervices" do not occupy more than twenty-five percent of the building footprint. 310 Code Mass. Regs. § 9.02 (1994).

[7] "Historic High Water Mark means the high water mark which existed prior to human alteration of the shoreline by filling, dredging, excavating, impounding, or other means," while "Historic Low Water Mark means the low water mark which existed prior to human alteration of the shoreline by filling, dredging, excavating, impounding or other means." 310 Code Mass. Regs. § 9.02 (2000).

In September, 2009, NYF submitted an application to DEP to amend its waterways license, seeking (1) a reduction of the amount of floor area required to be used as FPAs from 32,225 square feet to 12,570 square feet, and (2) approval for flexibility in where to locate the FPAs on the ground floor of the building.  NYF's application noted that Harborview rested on filled "tidal flats" -- the area between the historic high and low water marks -- and argued that though the property was initially classified as "Commonwealth [t]idelands" due to the BRA's ownership, its classification should change given that NYF is a private entity.

Pursuant to its regulations, DEP reviewed NYF's application, held a public hearing, and considered the company's response to comments.  On November 9, 2010, DEP issued a written determination denying the requested amendment.  As stated in the determination's findings, this decision was based on the fact that when the original license was granted, the property was on previously filled "Commonwealth [t]idelands," and that "[o]nce held by the Commonwealth, the type of tidelands can't be changed back without a specific act of the [L]egislature."

On November 24, 2010, NYF requested an adjudicatory hearing before DEP to challenge the denial of its license amendment application.  On cross motions for summary decision, the presiding officer issued a recommended final decision on

November 21, 2011, affirming DEP's written determination, which the DEP Commissioner adopted in his final decision on November 22, 2011.

As a result, NYF filed a complaint in Superior Court seeking judicial review of DEP's final decision pursuant to G. L. c. 30A, § 14, and a declaration that certain provisions of the Waterways Regulations are ultra vires.[8]  After holding a hearing on NYF's motions for judgment on the pleadings and for partial summary judgment, a judge denied the motions, affirming DEP's final decision and denying declaratory relief in a written memorandum of decision and order.  NYF appeals from the resulting amended judgment.

2.  Discussion.  A.  Public trust doctrine.  NYF's claim implicates our public trust doctrine, and therefore, "[t]o resolve this dispute we must consider in historical perspective the allocation of rights among private parties, the Commonwealth, and the public to use, own and enjoy one of the Commonwealth's most precious natural resources, its shore." Boston Waterfront Dev. Corp. v. Commonwealth, 378 Mass. 629, 630 (1979) (Boston Waterfront).  See Arno v. Commonwealth, 457 Mass.

---

[8] NYF also claimed that the Commonwealth had relinquished all of its rights, title, and interest to the property as a result of the Navy Yard Act, and that the Federal government had adversely possessed the property, thereby extinguishing any interests of the Commonwealth in the property.  Later, NYF voluntarily dismissed these counts of its complaint.  Thus these issues are not before us.

434, 449 (2010) ("Throughout history, the shores of the sea have been recognized as a special form of property of unusual value; and therefore subject to different legal rules from those which apply to inland property"), quoting from Boston Waterfront, supra at 631.

Under common law, private ownership in coastal land could historically extend only landward of the mean high water mark. Arno v. Commonwealth, supra. Seaward of the high water mark, ownership remained with "the Crown [and eventually the Massachusetts Bay Colony, followed by the Commonwealth,] but subject to the rights of the public to use the coastal waters for fishing and navigation." Ibid., quoting from Opinion of the Justices, 365 Mass. 681, 684 (1974). This changed, however, with the Colonial Ordinance of 1641-1647, which authorized the transfer of title to property between the high and low water marks -- the tidal flats -- to private parties, though this title has always had "strings attached." Arno v. Commonwealth, 457 Mass. at 449, quoting from Boston Waterfront, 378 Mass. at 637. While "[g]reater public rights exist in submerged lands, the land lying seaward of the low water mark," Arno v. Commonwealth, supra at 450, both tidal flats and submerged lands are referred to collectively as "tidelands," id. at 436, and "[a]ll tidelands below [the historic] high water mark are subject to [the public trust doctrine]." Trio Algarvio, Inc. v.

Commissioner of Dept. of Envtl. Protection, 440 Mass. 94, 97 (2003).

General Laws c. 91, the Waterways Act, represents the modern embodiment of the public trust doctrine, and "governs . . . water- and nonwater-dependent development in tidelands and the public's right to use those lands." Moot v. Department of Envtl. Protection, 448 Mass. 340, 342 (2007). As such, those parties seeking to put tidelands to either water- or nonwater-dependent use -- e.g., filling tidelands, constructing or extending wharves, piers, dams, bridges or other structures -- must first obtain a license pursuant to c. 91. DEP administers this licensing program, as "[t]he Legislature has designated DEP as the agency charged with responsibility for protecting public trust rights in tidelands through the c. 91 licensing program." Alliance to Protect Nantucket Sound, Inc. v. Energy Facilities Siting Bd., 457 Mass. 663, 678 (2010). See G. L. c. 91, § 2.

In 1983, the Legislature made numerous material amendments to c. 91. See St. 1983, c. 589, § 21. Foremost for our purposes, the Legislature added several definitions to its waterways statutory scheme that are controlling to this day. First, the Legislature defined "[t]idelands" as "present and former submerged lands and tidal flats lying below the mean high water mark." G. L. c. 91, § 1. Next, the Legislature clarified the meanings of "Commonwealth tidelands" and "[p]rivate

tidelands."  "Commonwealth tidelands" are "tidelands held by the commonwealth in trust for the benefit of the public or held by another party by license or grant of the commonwealth subject to an express or implied condition subsequent that it be used for a public purpose," while "[p]rivate tidelands" are those "held by a private party subject to an easement of the public for the purposes of navigation and free fishing and fowling and of passing freely over and through the water."  Ibid.

Consistent with the Legislature's delegation of authority to DEP to protect the public trust, see G. L. c. 91, §§ 2, 10, 18, the agency first promulgated the Waterways Regulations in 1990 to effectuate the Waterways Act's purposes.  310 Code Mass. Regs. §§ 9.01 et seq.  These regulations, which were submitted to the Legislature for review in accordance with the statute's 1983 amendments, see G. L. c. 91, § 18, expounded on the key definitions described by the statute.  Although DEP's definitions of "[t]idelands"[9] and "[p]rivate [t]idelands"[10]

_____

[9] "Tidelands" are "present and former submerged lands and tidal flats lying between the present or historic high water mark, whichever is farther landward, and the seaward limit of state jurisdiction.  Tidelands include both flowed and filled tidelands, as defined in [this section]."  310 Code Mass. Regs. § 9.02 (1994).

[10] "Private [t]idelands" are defined as "tidelands held by a private person subject to an easement of the public for the purposes of navigation and free fishing and fowling and of passing freely over and through the water."  310 Code Mass. Regs. § 9.02 (2000).

largely track the language of the statute, DEP further expressly defined "Commonwealth [t]idelands" to mean "tidelands held by the Commonwealth, or by its political subdivisions or a quasi-public agency or authority, in trust for the benefit of the public; or tidelands held by a private person by license or grant of the Commonwealth subject to an express or implied condition subsequent that it be used for a public purpose" (emphasis supplied).  310 Code Mass. Regs. § 9.02 (1994).

B.  DEP regulations.  On appeal, NYF challenges DEP's Waterways Regulations, arguing that the agency's definition of "Commonwealth [t]idelands" exceeds its regulatory authority and violates the public trust doctrine.  NYF challenges DEP's interpretation of both parts of the statutory definition:  (1) which tidelands may be attributed to "the Commonwealth," and (2) which agencies or political subdivisions constitute "the Commonwealth."  NYF asserts that only present or former submerged lands may be classified as "Commonwealth [t]idelands" and therefore subjected by DEP to the FPA requirements, and that including political subdivisions or quasi public agencies such as the BRA under the umbrella of "the Commonwealth" is inconsistent with the language of c. 91.

When considering the validity of lawfully promulgated regulations, we utilize a two-part test.  "Using conventional tools of statutory interpretation, we first consider 'whether

the Legislature has spoken with certainty on the topic in question, and if we conclude that the statute is unambiguous, we give effect to the Legislature's intent.'" Biogen IDEC MA, Inc. v. Treasurer & Receiver Gen., 454 Mass. 174, 186 (2009) (citation omitted). However, "if the Legislature has not directly addressed the issue and the statute is capable of more than one rational interpretation, we proceed to determine whether the agency's interpretation may 'be reconciled with the governing legislation.' . . . The ultimate question is whether the policy embodied by the agency's interpretation is reasonable." Id. at 187, quoting from Goldberg v. Board of Health of Granby, 444 Mass. 627, 633 (2005). See G. L. c. 30A, § 14(7)(a)-(d). Although an agency may only exercise "the powers and duties expressly conferred upon it by statute and such as are reasonably necessary to carry out its mission," Commonwealth v. Maker, 459 Mass. 46, 50 (2011) (citation omitted), a plaintiff "challenging the validity of an agency's regulations has a formidable burden." Biogen IDEC MA, Inc. v. Treasurer & Receiver Gen., 454 Mass. at 187. After reviewing the challenge to DEP's regulatory definitions, we conclude that NYF has not satisfied this burden.

i. Commonwealth tidelands may include tidal flats. Although c. 91, § 1, expressly defines "[t]idelands" as "present and former submerged lands and tidal flats lying below the mean

high water mark," NYF maintains that the statutory phrase "Commonwealth tidelands" only includes present and former submerged lands, not tidal flats.

Of course, "the language of the statute is the principal source of insight into the legislative intent," Acme Laundry Co. v. Secretary of Envtl. Affairs, 410 Mass. 760, 770 (1991), and "[t]he Legislature must be presumed to have meant what the words plainly say." Condon v. Haitsma, 325 Mass. 371, 373 (1950). Here, the text of the Waterways Act clearly states that tidelands are "present and former submerged lands and tidal flats lying below the mean high water mark." G. L. c. 91, § 1. The very next definitions listed are those for "Commonwealth tidelands" and "[p]rivate tidelands" (emphases supplied), which suggests that both of these definitions incorporate the earlier definition of "tidelands," and therefore apply to both submerged lands and tidal flats. See Commonwealth v. Hilaire, 437 Mass. 809, 816 (2002) ("When the Legislature uses the same term in the same section, or even in different statutory sections, the term should be given a consistent meaning throughout"); Commonwealth v. Raposo, 453 Mass. 739, 746 (2009).

The purpose behind c. 91 also supports DEP's interpretation. "General Laws c. 91 sets out to 'preserve and protect,' under [DEP's] watch, the public's rights in tidelands." Moot v. Department of Envtl. Protection, 448 Mass.

at 347. As explained previously, c. 91 represents the modern iteration of the public trust doctrine. This public trust has always applied to both submerged lands and tidal flats, as both types of shore land were recognized as special forms of property with unusual value. See Trio Algarvio, Inc. v. Commissioner of Dept. of Envtl. Protection, 440 Mass. at 97; Arno v. Commonwealth, 457 Mass. at 449. Although a distinction between submerged lands and tidal flats is recognized under the doctrine, with submerged lands entitled to more public protection, id. at 450, tidal flats are still of significant public concern and are not "private" in the traditional sense, as NYF appears to contend. Rather, a categorical exclusion of all tidal flats from the statutory definition of "Commonwealth tidelands," regardless of ownership, undermines the public rights and interest in this special form of property.

In light of the statutory language and purpose, DEP's interpretation of "Commonwealth [t]idelands" to include both submerged lands and tidal flats is reasonable and entitled to deference. See Biogen IDEC MA, Inc. v. Treasurer & Receiver Gen., 454 Mass. at 187; Goldberg v. Board of Health of Granby, 444 Mass. at 633.

ii. Definition of "Commonwealth." NYF next challenges DEP's regulatory definition of "Commonwealth" in the phrase "Commonwealth [t]idelands," which expressly includes the

Commonwealth's political subdivisions and quasi public agencies or authorities.  310 Code Mass. Regs. § 9.02.  NYF correctly contrasts the regulation with c. 91, which contains no such express reference to political subdivisions or quasi public agencies or authorities within either its definition of "Commonwealth tidelands" or "[p]rivate tidelands."[11]  The statute, however, specifies only two categories of tidelands: "Commonwealth tidelands" and "[p]rivate tidelands," thereby requiring a choice to be made between the two when classifying the property of political subdivisions and quasi public agencies or authorities.  "Private tidelands" are defined by statute as "tidelands held by a private party . . . ."  The ordinary meaning of "private" is "[r]elating or belonging to an individual, as opposed to the public or the government." Black's Law Dictionary 1315 (9th ed. 2009).  Contrast Lafayette Place Assocs. v. Boston Redev. Authy., 427 Mass. 509, 532 (1998)

---

[11] While G. L. c. 91, § 38, as appearing in St. 2010, c. 309, § 2, goes on to include both "the commonwealth" and "its political subdivisions" in the definition of "[c]laimant" as used in §§ 38 to 48 of the statute (concerning abandoned vessels), this does little to fill the gap left in the definitions of "Commonwealth tidelands" and "[p]rivate tidelands" in § 1.  Merely applying the principle that when "specific language appears in one section of a statute and is absent from a related section, the absent language should not be read into the provision from which it is missing," Tilcon Mass., Inc. v. Commissioner of Rev., 30 Mass. App. Ct. 264, 269 (1991), as NYF urges us to do, fails to provide a workable solution as it would prevent the contested category from meeting either the "Commonwealth" or "[p]rivate" tideland definitions.

("The BRA is certainly a public body, a governmental entity of some sort performing public functions").  Interpreting "private party" under the statute to include a political subdivision or quasi public agency runs counter to the plain meaning of "private."  See Telesetsky v. Wight, 395 Mass. 868, 872 (1985) (statute "must be afforded its plain meaning").

The plain meaning of "Commonwealth" in this context is less obvious.  Whether the reference in c. 91 to "Commonwealth tidelands" is meant to include tidelands held by "political subdivisions or a quasi-public agency or authority" is not without ambiguity.  We recognize that "[s]tatutory silence, like statutory ambiguity, often requires that an agency give clarity to an issue necessarily implicated by the statute but either not addressed by the Legislature or delegated to the superior expertise of agency administrators."  Goldberg v. Board of Health of Granby, 444 Mass. at 634.  See Middleborough v. Housing Appeals Comm., 449 Mass. 514, 523 (2007).  "The ultimate question is whether the policy embodied by the agency's interpretation is reasonable."  Biogen IDEC MA, Inc. v. Treasurer & Receiver Gen., 454 Mass. at 187.  We conclude that DEP's interpretation that tidelands held by quasi public agencies and political subdivisions of the Commonwealth fall within the statutory term "Commonwealth tidelands" is reasonable and entitled to deference given the need to choose between only

two categories of tidelands (private and Commonwealth), the public rather than private nature of political subdivisions and quasi public authorities, and the ambiguity of the statutory term "Commonwealth," which in general understanding may or may not include such political subdivisions and quasi public agencies. See ibid.

DEP's interpretation is also buttressed by the process prescribed for DEP's rulemaking authority, which reserves oversight of promulgated regulations for the Legislature. G. L. c. 90, § 18. "That the Legislature did not act to challenge the [agency's] regulations lends weight to the conclusion that the [agency] acted within its delegated authority in promulgating them." MRI Assocs., Inc. v. Department of Pub. Health, 70 Mass. App. Ct. 337, 342 n.8 (2007). Compare Wilson v. Commissioner of Transitional Assistance, 441 Mass. 846, 853-854 (2004).

C. DEP's decision not to grant the amendment. Although we have rejected NYF's challenge to the validity of the regulations, we must still address DEP's particular application of the statute and regulations to NYF's proposed license amendment. Generally, "the application of a regulation to the particular facts of a case is within an agency's discretion and we accord an agency's interpretation of its own regulations substantial deference." Biogen IDEC MA, Inc. v. Treasurer & Receiver Gen., 454 Mass. at 184. The court will only overturn

the agency's action "if it was arbitrary, unreasonable or inconsistent with the plain terms of the regulation itself." Ibid. In our review, we exercise considerable restraint, as "[t]he court should be slow to decide that a public board has acted unreasonably or arbitrarily and should search for some ground which reasonable [people] would regard as a proper basis for the agency's action." Fioravanti v. State Racing Commn., 6 Mass. App. Ct. 299, 302 (1978). We conclude that DEP's application of its regulations and denial of NYF's proposed license amendment was not arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law. G. L. c. 30A, § 14(7)(g).

During the time the BRA owned the property, from 1979 until 2005, the property's tidelands qualified as "Commonwealth tidelands" due simply to the BRA's ownership. As a quasi public authority of a political subdivision of the Commonwealth, it falls under the umbrella of "Commonwealth" for the purpose of waterways licensing.[12] This is reflected in DEP's February,

---

[12] "The BRA is both a 'redevelopment authority' under G. L. c. 121B, § 4, and an 'urban renewal agency' under G. L. c. 121B, § 9. Additionally, it serves as the planning board for the city of Boston and monitors private development under G. L. c. 121A." Mahajan v. Department of Envtl. Prot., 464 Mass. 604, 606 (2013) (footnote omitted). Of its many enumerated powers, "[p]erhaps the most significant power granted to the BRA is the power of eminent domain." Ibid. See Lafayette Place Assocs. v. Boston Redev. Authy., 427 Mass. at 533 (classifying BRA as a public employer).

2004, written determination regarding the property in reference to the original license -- "[t]he tidelands are categorized as Commonwealth Tidelands because the site is owned by the Boston Redevelopment Authority, a public agency" -- and as noted by both parties, the Harborview project was designed with this categorization in mind.[13]

The conveyance of the property from the BRA to NYF's predecessor in interest and then to NYF, both private entities, did not change the classification of the tidelands as "Commonwealth [t]idelands" for two reasons.  First, once the property was conveyed to NYF, the waterways license was automatically transferred to NYF pursuant to 310 Code Mass. Regs. § 9.23, which transferred all obligations and responsibilities under the license to the new owner, including the FPA requirements.[14]  While DEP has the authority to renew and

---

[13] As the original determination observes, "The entire site lies on filled Commonwealth Tidelands and the project has been planned to comply with the appropriate dimensional and use limitations of the applicable Waterways Regulations."

[14] Under 310 Code Mass. Regs. § 9.23(1) (1996),

"Unless otherwise provided in the license, a valid license shall run with the land and shall automatically be transferred upon a change of ownership of the affected property within the chain of title of which the license has been recorded.  All rights, privileges, obligations, and responsibilities specified in the license shall be transferred to the new landowner upon recording of the changed ownership."

amend licenses, 310 Code Mass. Regs. §§ 9.24, 9.25 (1996), DEP is not at liberty to transform the nature of the property from "Commonwealth" to "private" tidelands or extinguish the public's rights in the property. "[O]nly an act of or an express delegation by the Legislature could extinguish the public's rights in the parcel." Arno v. Commonwealth, 457 Mass. at 448.[15] The Legislature has taken no such action for the property in question.

Secondly, when NYF gained title to the property, it did so "subject to an express or implied condition subsequent that it be used for a public purpose." 310 Code Mass. Regs. § 9.02 (1996) (definition of "Commonwealth [t]idelands"). This contention is supported by the deed from the BRA to NYF's predecessor in interest. The deed incorporates a "Land Disposition Agreement" (agreement) that explicitly includes the FPA requirements now contested by NYF among other conditions

---

Additionally, although it was LDA, the BRA's tenant, that originally applied for the license, under the regulations "[a]pplicant means any person submitting a license or permit application or other request for action by the [DEP] pursuant to 310 [Code Mass. Regs. §] 9.00, and shall include the heirs, assignees, and successors in interest to such person" (emphasis supplied). 310 Code Mass. Regs. § 9.02 (1996). Thus, Navy Yard Four Limited Partnership (NYF's predecessor) occupied LDA's shoes with respect to the license application.

[15] This requirement applies to both tidal flats and submerged lands. Arno v. Commonwealth, 457 Mass. at 452 ("The process of divesting the public of its rights in tidal flats also requires an act of the Legislature").

stemming from the classification of the property as lying on "Commonwealth [t]idelands." Furthermore, the deed establishes an explicit condition subsequent and right of reentry on behalf of the BRA if NYF fails to comply with the conditions contained in the agreement. While the BRA eventually came to support NYF's amendment application, and NYF argues that it and the BRA may amend this agreement at any time, the BRA, like DEP, "[can]not extinguish forever claims that [it] was not free to settle in the first place." Arno v. Commonwealth, 457 Mass. at 453.

Lastly, NYF argues that the classification of its property as lying on "Commonwealth [t]idelands" contradicts the presumptions embedded in DEP's definitions of both "Commonwealth [t]idelands" and "[p]rivate tidelands."[16] The presumptions in

---

[16] The Waterways Regulations state that in applying the definition of "Commonwealth [t]idelands," DEP

"shall act in accordance with the following provisions: (a) [DEP] shall presume that tidelands are Commonwealth tidelands if they lie seaward of the historic low water mark or of a line running 100 rods (1650 feet) seaward of the historic high water mark, whichever is farther landward; such presumption may be overcome only if [DEP] issues a written determination based upon a final judicial decree concerning the tidelands in question or other conclusive legal documentation establishing that, notwithstanding the Boston Waterfront decision of the Supreme Judicial Court, such tidelands are unconditionally free of any proprietary interest in the Commonwealth; (b) [DEP] shall presume that tidelands are not Commonwealth tidelands if they lie landward of the historic low water mark or of a line running 100 rods (1650 feet) seaward of

question essentially hold that if tidelands fall landward of the

historic low water mark, as with the Harborview project, DEP

will presume the tidelands in question are private tidelands and

not Commonwealth tidelands.  This presumption may be overcome,

however, by a "showing that such tidelands . . . are not held by

a private person."  (See note 16, supra.)  NYF argues that DEP

has not made this showing, as NYF is a private entity.  Of

course, at the time of the licensing determination, the property

was held by the BRA, a public entity, and the license, including

its obligations, was transferred to NYF as described above.

DEP's application of the regulations likewise recognizes the

express language of the statute -- that private entities may

---

the historic high water mark, whichever if [sic] farther landward; such presumption may be overcome only upon a showing that such tidelands, including but not limited to those in certain portions of the Town of Provincetown, are not held by a private person."

310 Code Mass. Regs. § 9.02 (1994).  The regulatory definition of "[p]rivate [t]idelands" specifies that DEP

"shall presume that tidelands are private tidelands if they lie landward of the historic low water mark or of a line running 100 rods (1650 feet) seaward of the historic high water mark, whichever is farther landward; such presumption may be overcome upon a showing that such tidelands, including but not limited to those in certain portions of the Town of Provincetown, are not held by a private person or upon a final judicial decree that such tidelands are not subject to said easement of the public [for navigation, fishing, fowling, and passing freely over and through the water]."

310 Code Mass. Regs. § 9.02 (2000).

hold "Commonwealth tidelands" subject to an implied or explicit condition subsequent that the property be used to further a public purpose.  G. L. c. 91, § 1.  Such express statutory language and categorization overrules the ordinary regulatory presumptions as well.  In sum, DEP's application of the statutory and regulatory requirements was a reasonable and proper basis for the denial of NYF's requested license amendment.  See Teamsters Joint Council No. 10 v. Director of Dept. of Labor and Workforce Dev., 447 Mass. 100, 106 (2006) (reasonably proper agency decision is not arbitrary or capricious).

3.  Conclusion.  For the above stated reasons, we affirm the amended judgment in favor of DEP.

So ordered.