NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

17-P-355                                            Appeals Court

COMMERCIAL WHARF EAST CONDOMINIUM ASSOCIATION  vs.  BOSTON BOAT BASIN, LLC, & others.[1]


No. 17-P-355.

Suffolk.     November 13, 2017. - July 10, 2018.

Present:  Kinder, Desmond, & Sacks, JJ.


Trust, Public trust.  Department of Environmental Protection. License.  Due Process of Law, Commonwealth's interest in tidelands.  Administrative Law, Agency's authority.  Real Property, Restrictions, License.  Land Court.  Practice, Civil, Findings by judge, Contempt.  Estoppel.  Judicial Estoppel.



Civil action commenced in the Land Court Department on July 7, 2006.

The case was heard by Keith C. Long, J., and a complaint for contempt, filed on September 8, 2006, also was heard by him.

_____

[1] The only other defendant appearing in this appeal is Charles Lagasse, individually and as manager of Boston Boat Basin, LLC.  The additional defendants in the Land Court were Yovette Mumford, individually and as a member of MGM Commercial Wharf, LLC; MGM Commercial Wharf, LLC; Boston Yacht Haven Marina, LLC; Commercial Wharf Marina, LLC; and Garron Markey, individually and as manager of MGM Commercial Wharf, LLC.  These defendants were subject to the judgment entered in the Land Court but did not appeal.

Patrick P. Dinardo for Boston Boat Basin, LLC, & another.
John M. Allen (William A. Zucker also present) for the plaintiff.

SACKS, J.  The defendants Boston Boat Basin, LLC, owner of an inn and marina on Boston harbor, and its manager (together, Boston Boat), appeal from a Land Court judgment ordering Boston Boat to comply with certain property use restrictions -- agreed to by one of Boston Boat's predecessors in title -- that benefit an abutter, plaintiff Commercial Wharf East Condominium Association (CWECA).  On appeal, Boston Boat presses its attempt to cast off these restrictions on the ground that they impermissibly "limit the use of [its] marina and inn almost exclusively to private clients" and "restrict the public's ability to enjoy Boston Harbor."  Boston Boat claims that the restrictions thus violate the public trust doctrine, which, in general terms, protects public rights in "tidelands," i.e., "present and former submerged lands and tidal flats lying below the mean high water mark," G. L. c. 91, § 1, as amended by St. 1983, c. 589, § 21, unless those right are properly relinquished.[2]  See Arno v. Commonwealth, 457 Mass. 434, 436,

---

[2] Tidelands include both "Commonwealth tidelands" and "private tidelands."  G. L. c. 91, § 1.  "Commonwealth tidelands" are defined as "tidelands held by the commonwealth in trust for the benefit of the public or held by another party by license or grant of the commonwealth subject to an express or implied condition subsequent that it be used for a public

455-456 (2010).  Boston Boat also appeals from the judge's finding that it was in contempt of a preliminary injunction earlier obtained by CWECA to enforce the restrictions against a predecessor in title.

We affirm the judgment requiring compliance with the restrictions as the judge interpreted them.  We conclude, however, that the preliminary injunction did not apply to Boston Boat.  Therefore, the contempt finding cannot stand.

Background.  We draw our description of the case largely from the judge's detailed decision.  Except as to the contempt claim, the pertinent facts are undisputed.

1.  Prior proceedings.  Boston Boat owns and operates an inn and marina (the locus), known as Boston Yacht Haven, at the seaward end of Commercial Wharf on Boston harbor, on or over Commonwealth tidelands.  See note 2, supra.  Boston Boat holds a license under G. L. c. 91, the Waterways Act administered by the Department of Environmental Protection (the department), to use the locus.  The sole land access is by easement over the property of CWECA, an association of owners of certain condominiums located at the landward end of the wharf.

---

purpose."  Ibid.  "Private tidelands" are defined as "tidelands held by a private party subject to an easement of the public for the purposes of navigation and free fishing and fowling and of passing freely over and through the water."  Ibid.

In 2006, CWECA filed this suit against the locus's prior owner of record and its affiliates (the prior owners[3]) to enforce certain restrictions on the use of the locus.  CWECA obtained a preliminary injunction requiring the prior owners to comply with those restrictions as the judge interpreted them.[4]  In 2009, CWECA obtained a partial summary judgment ruling that rejected the prior owners' claim that the restrictions violated the public trust doctrine, and reiterated the proper interpretation of the restrictions, leaving the issue of damages for trial.  Also in 2009, the prior owner of record filed for bankruptcy, and the mortgagee bank foreclosed.  The purchaser at the foreclosure auction sold the locus to Boston Boat in 2010.

After some inconclusive procedural skirmishing over whether Boston Boat should be made a defendant in this action, CWECA filed in July of 2011 a contempt complaint asserting that Boston Boat was using the locus in violation of the 2006 preliminary injunction.  That injunction remained in effect but had not been

---

[3] We use the phrase "prior owners" to refer to the owner of record, MGM Commercial Wharf, LLC, and the affiliated persons and entities listed in note 1, supra, other than Lagasse.

[4] The injunction was later clarified and extended in ways not relevant here, and a single justice of this court denied the prior owners' petition for relief from the injunction.  Also, the prior owners, one of which then held the license, moved to join the department as a necessary party.  The department did not respond to the motion, and it was denied.

made permanent. CWECA subsequently amended its underlying complaint to add Boston Boat as a party and to seek declaratory and injunctive relief against Boston Boat regarding the validity and interpretation of the restrictions. In December of 2011, the judge held a trial on both the underlying and contempt complaints. Only CWECA and Boston Boat (and not the prior owners) participated in the trial.

In December of 2016, the judge issued a decision[5] (1) rejecting Boston Boat's claim that the restrictions interfered with public trust rights and (2) finding Boston Boat in contempt of the 2006 preliminary injunction. The resulting judgment required Boston Boat to comply with the restrictions, as the judge interpreted them, and which we now describe.

2. The restrictions. The restrictions on Boston Boat's use of the locus stem from three sources: conditions on an access easement;[6] a zoning variance and permit limiting the

---

[5] The record does not explain the passage of time between the trial and the decision.

[6] Under an easement recorded in 1978, the owner of the locus has a nonexclusive right to pass and repass to and from the locus, on foot or by vehicle, over the condominium parking and driveway areas now owned by CWECA, subject to the right (subsequently conveyed to CWECA) to manage and control those areas and collect fees for their use. The easement derives from the one at issue in Commercial Wharf E. Condominium Assn. v. Waterfront Parking Corp., 407 Mass. 123 (1990). The locus is identified as Lot 1 in that decision. Id. at 126-127.

number of parking spaces at the locus;[7] and, most significantly, a 2003 settlement agreement between CWECA and one of Boston Boat's predecessors in title, the developer of the locus (the 2003 agreement).[8]  The 2003 agreement, which resolved a suit by CWECA against the developer, encumbered and ran with the locus for the benefit of CWECA and was duly recorded.  As summarized and interpreted by the judge, the agreement included restrictions that:

> "(1) regulate deliveries and parking at the [i]nn [and] [m]arina, (2) prohibit its use by ferries, party, cruise, charter, or excursion boats, boats that sell alcoholic beverages, and boats that permit or provide gambling or gaming activities except for private, social games with no more than six participants, (3) prohibit its use as a 'function hall,' and (4) prohibit its use for 'social events, such as, but not limited to, weddings, bar mitzvahs, school dances or holiday parties,' except for up to four 'special events' per year, open only to 'privately invited guests or narrowly targeted audiences,' for which [CWECA] must be given at least thirty-days prior notice."

These are the restrictions that Boston Boat sought to void as inconsistent with the public trust doctrine.

---

[7] In 1997, a developer, in order to reconstruct and expand the marina facilities at the locus, sought and obtained a variance and conditional use permit from the Boston board of appeal.  The decision granting the permit provided that "[s]ix parking spaces will be provided on the pier for transient and employee parking related to marina services."  The permit itself is not in the record.  The judge treated the six-parking-space provision as binding.

[8] The 2003 agreement incorporated several documents and was amended in 2005.  For convenience we refer to these documents collectively as the 2003 agreement.

3. The c. 91 license. In 1997, the department issued to the developer a thirty-year c. 91 license for the locus. Boston Boat succeeded to that license in 2010.[9] The license authorized construction and maintenance of a pier, marina service building, and float system, with such structures to "be limited to the following uses:  to provide a public recreational boating facility; public access to navigable waters; and accessory uses to the marina including a restaurant primarily serving marina patrons, a marine chandlery, office, crew quarters, vehicular circulation and parking."  Notably, the license contained a "special condition" that provided in pertinent part:

> "In partial compensation for the private use of structures
> on Commonwealth tidelands, which interferes with the rights
> of the public to use such lands, the [l]icensee shall allow
> the public to pass on foot, for any purpose and for 24
> hours per day, on the proposed pier . . . .  To the extent
> that the [l]icensee has the right to allow the public to
> pass across Commercial Wharf to its proposed pier pursuant
> to the [easement], the [l]icensee shall allow the public
> such a right of passage. . . .  In no event shall the
> [d]epartment require the [l]icensee to provide access
> across Commercial Wharf if the licensee does not have the
> legal right to provide such access."

The license also included numerous "standard" conditions, many of them also imposed by c. 91 itself, including provisions (1) confirming the department's authority to control changes in the

---

[9] See 310 Code Mass. Regs. § 9.23 (1996) ("a valid [c. 91] license shall run with the land").

use of the licensed locus;[10] (2) describing generally the nature of the public rights protected;[11] and (3) disclaiming any intent to infringe on the rights of property owners other than the licensee.[12]

Discussion. 1. Authority to enforce public trust rights. We now come to Boston Boat's claim that the restrictions agreed to by its predecessors in title unduly restrict public access to and use of its waterfront locus, and therefore violate the public trust doctrine and are void. The judge, seeing no such

---

[10] Condition 3 provides in part that "[a]ny change in use . . . of any structure . . . authorized herein shall require the issuance by the [d]epartment of a new [w]aterways [l]icense. . . . Any unauthorized substantial change in use . . . shall render this [w]aterways [l]icense void." See G. L. c. 91, § 18. Condition 4 provides in part that the license "shall be revocable by the [d]epartment for noncompliance with the terms and conditions set forth herein." See id. §§ 15, 18.

[11] Condition 9 provides in part that, because the license authorizes structures on "Commonwealth [t]idelands," the licensee "shall not restrict the public's right to use and pass freely, for any lawful purpose, upon lands lying seaward of the low water mark. Said lands are held in trust by the Commonwealth for the benefit of the public. . . . No restriction on the exercise of these public rights shall be imposed unless otherwise expressly provided in this license." See G. L. c. 91, § 1.

[12] Condition 6 provides that nothing in the license "shall be construed as authorizing encroachment in, on, or over property not owned or controlled by the [l]icensee, except with the written consent of the owner or owners thereof." See G. L. c. 91, § 15. The license also states: "Nothing in this license shall be so construed as to impair the legal rights of any person." See id. § 17.

impact on public rights, rejected this claim. We likewise reject it, but on a different ground: Boston Boat had no authority in the first place to seek judicial enforcement of public trust rights in this private litigation.[13]

"Only the Commonwealth, 'or an entity to which the Legislature has delegated authority expressly, may act to further public trust rights.'" Moot v. Department of Envtl. Protection, 448 Mass. 340, 347 (2007) (Moot I), S.C., 456 Mass. 309 (2010) (Moot II), quoting from Fafard v. Conservation Commn. of Barnstable, 432 Mass. 194, 197 (2000). Accord Arno, 457 Mass. at 451. The primary entity to which the Legislature has delegated this authority is the department, as administrator of c. 91, which "generally is viewed as an encapsulation of the Commonwealth's public trust authority and obligations."[14] Arno, 457 Mass. at 454, quoting from Fafard, 432 Mass. at 200 n.11. "[T]he Legislature has designated [the department] as the agency

---

[13] The judge's conclusion on the merits that the restrictions did not interfere with public trust rights was not expressly incorporated in the judgment. Accordingly, although we reject Boston Boat's claim at the threshold rather than on the merits, no amendment to the judgment is necessary.

[14] The court has noted, however, that c. 91, "the Waterways Act[,] is not necessarily coextensive with the public trust doctrine"; "certain aspects of the Legislature's public trust authority may not be contained in the Waterways Act and, indeed, may never have been recodified" since the colonial era. Arno, 457 Mass. at 454 n.22, citing Boston Waterfront Dev. Corp. v. Commonwealth, 378 Mass. 629, 634-635 (1979).

charged with responsibility for protecting public trust rights in tidelands through the c. 91 licensing program." Navy Yard Four Assocs., LLC v. Department of Envtl. Protection, 88 Mass. App. Ct. 213, 218 (2015), quoting from Alliance to Protect Nantucket Sound, Inc. v. Energy Facilities Siting Bd., 457 Mass. 663, 678 (2010). In administering c. 91, the department must "ensur[e] that the tidelands are utilized only for water-dependent uses or otherwise serve a proper public purpose." G. L. c. 91, § 2, as amended by St. 1983, c. 589, § 22.

The court has enforced the express delegation principle strictly. Thus, in Fafard, where there was no statutory delegation to a town or its conservation commission of authority to enforce public trust rights, the commission could not prohibit landowners from building a pier on the basis that the commission viewed the pier as conflicting with such rights. Fafard, 432 Mass. at 195-196, 197-198, 199 & n.10.

Similarly, in Moot I, the court held that the department itself, despite its broad c. 91 responsibilities, could not issue a regulation exempting landlocked tidelands from c. 91 licensing requirements, because the Legislature had not expressly authorized such a relinquishment of public rights. Moot I, 448 Mass. at 347, 349. The court emphasized that c. 91 "sets out to 'preserve and protect,' under the department's watch, the public's rights in tidelands," id. at 347, and "[t]he

department has no authority to forgo [that] responsibility . . . whether for administrative convenience, conservation of the department's resources or any other laudable agency reason." Id. at 350. Nor was the court willing to step into the department's shoes and decide for itself whether the project at issue satisfied the "proper public purpose" criterion of c. 91. "[I]t is not [the court's] role to determine whether the proposed . . . project meets that statutory requirement."[15] Id. at 350-351.

And in Arno, the court held that the Attorney General and the Land Court had no authority to relinquish public trust rights through land registration proceedings. Arno, 457 Mass. at 451-453. Although the Attorney General had "expressly waived any such rights" in a certain parcel during 1922 registration proceedings, id. at 436, the waiver was invalid, because the land registration statutes did not "contain[] an express delegation, to the Land Court or to the Attorney General, of the Legislature's power to relinquish the public's rights in tidelands." Id. at 451.

---

[15] In response to the Moot I decision, the Legislature amended c. 91 to provide, among other things, that "[n]o license shall be required under this chapter for fill on landlocked tidelands, or for uses or structures within landlocked tidelands." G. L. c. 91, § 18, as amended by St. 2007, c. 168, § 6. The court upheld the validity of this amendment in Moot II, 456 Mass. at 314.

Here, Boston Boat purports to seek to enforce public trust rights, by asking the Land Court to invalidate use restrictions (agreed to by a predecessor in title) that assertedly infringe on such rights. But Boston Boat is not "an entity to which the Legislature has delegated authority expressly . . . to further public trust rights.'" Moot I, 448 Mass. at 347, quoting from Fafard, 432 Mass. at 197. Nor does Boston Boat point to any statute authorizing the Land Court, in a suit between private parties to enforce property use restrictions, to invalidate such restrictions as inconsistent with public trust rights. Given the Supreme Judicial Court's consistent and strict enforcement of the express delegation requirement, we reject the argument that the proper extent of public trust rights in a particular locus may be determined in private litigation such as the present case.[16]

In light of the department's preeminent responsibility in enforcing public trust rights through the c. 91 licensing

---

[16] There is nothing to the contrary in Maslow v. O'Connor, 93 Mass. App. Ct. 112 (2018), where we held that the rights of certain property owners to use a preexisting easement to travel the full length of a private way ending in tidelands were not impaired by a c. 91 license authorizing abutters to deposit fill at the end of the way. Id. at 117-118. The license itself disclaimed any such effect on private rights. Id. at 116. Here, in contrast, Boston Boat seeks to use the public trust doctrine embodied in c. 91 as a weapon to invalidate CWECA's private rights.

process, the department is in the best position to assess claims such as Boston Boat's.  As should be evident from our summary, supra, of some of the relevant conditions of Boston Boat's c. 91 license, the department has already considered, at least as a general matter, not only the proper balance between, but also the possibility of conflicts between, private rights and public trust rights.  The license authorizes Boston Boat to make specified uses of structures on Commonwealth tidelands, including "a public recreational boating facility" and "public access to navigable waters" as well as "accessory uses to the marina including a restaurant primarily serving marina patrons, a marine chandlery, office, crew quarters, vehicular circulation and parking."  The license recognizes that Boston Boat will make some "private use" of the locus, and that in "partial compensation" therefor, Boston Boat must allow public access on foot to its pier, unless it is determined that Boston Boat "does not have the legal right to provide such access."

Plainly, the license does not invalidate every restriction that might somehow diminish the public's ability to use the locus, as Boston Boat seems to contend.  Rather, licensure reflects a balance; it requires the department to determine that the pier and other structures on the locus "serve a proper public purpose and that said purpose shall provide a greater public benefit than public detriment to the rights of the public

in said lands."  G. L. c. 91, § 14, as amended by St. 1983,
c. 589, § 24; G. L. c. 91, § 18.[17]  See also id., § 18B.

We presume that the license as issued in 1997 met this
standard.  See James Constr. Co. v. Commissioner of Pub. Health,
336 Mass. 143, 146 (1957) ("the actions of public officials are
presumed to be regular and lawful" and to have "followed the
procedure prescribed by the Legislature"); LaPointe v. License
Bd. of Worcester, 389 Mass. 454, 459 (1983).  We leave it to the
department to determine whether Boston Boat is currently using
the locus in accordance with the license and, if not, how best
to proceed in order to vindicate public rights.[18]  Given the
department's special role in this area, Boston Boat may not
obtain judicial invalidation of restrictions on the use of the

---

[17] This standard applies regardless whether the licensed use
is "water-dependent," a point on which the parties differ.
Other standards and procedures vary according to whether the use
is water-dependent.  See G. L. c. 91, § 14 (water-dependent
uses); id. § 18 (nonwater-dependent uses).

[18] That the department may lack authority under c. 91 to
adjudicate competing private property claims, see Tindley v.
Department of Envtl. Quality Engr., 10 Mass. App. Ct. 623, 625-
626 (1980), does not mean the department lacks authority to
determine whether a private property right, particularly one
created after issuance of a c. 91 license, is inconsistent with
and may affect the status of that license.  The locus here
occupies "Commonwealth tidelands," defined in part as tidelands
"held by another party by license or grant of the commonwealth
subject to an express or implied condition subsequent that it be
used for a public purpose."  G. L. c. 91, § 1.  See note 11,
supra.

locus by asserting, in private litigation, their inconsistency with the public trust doctrine.[19]

2. Contempt. The judge found Boston Boat in contempt of the 2006 preliminary injunction, entered against the prior owners but never made permanent. The judge based the finding on Boston Boat's having allowed a separate entity to hold an event at the locus on June 21, 2011, before Boston Boat was a party to the case.[20] The judge found that the event, a "boats, burritos and beer" promotion conducted by a private marketing firm, violated the preliminary injunction's prohibitions against, among other things, using the locus as a "function hall." On appeal, Boston Boat challenges the judge's ruling -- which he

---

[19] Boston Boat has framed its argument in the alternative as a claim that, because the 2003 agreement infringed upon public trust rights, the developer and CWECA had no authority to enter into the 2003 agreement without the approval of the Commonwealth. Because the question of such infringement has yet to be determined, and because we hold that Boston Boat cannot ask a court to determine the question in the first instance, we do not discuss the argument further.

[20] Because the only contempt sanction the judge ordered was an award of CWECA's attorney's fees, and CWECA did not submit a request documenting those fees in the three months between Boston Boat's filing of a notice of appeal and the entry of the appeal in this court, no final contempt judgment has entered. We nevertheless exercise our discretion to reach Boston Boat's appeal of the contempt finding, because "[d]ismissal of the appeal would serve no purpose and might require the parties to return to reargue issues already briefed and argued." Arch Medical Assocs., Inc. v. Bartlett Health Enterprises, Inc., 32 Mass. App. Ct. 404, 405 n.3 (1992).

based alternatively on grounds of privity and judicial estoppel -- that Boston Boat was bound by the preliminary injunction despite not having been a party when it was issued or when the promotional event occurred.

"[A] civil contempt finding [must] be supported by clear and convincing evidence of disobedience of a clear and unequivocal command." Birchall, petitioner, 454 Mass. 837, 853 (2009).[21] We review the judge's ultimate finding of contempt for abuse of discretion, but we review underlying conclusions of law de novo and underlying findings of fact for clear error. Judge Rotenberg Educ. Center, Inc. v. Commissioner of the Dept. of Mental Retardation (No. 1), 424 Mass. 430, 443, 451 (1997). Our review is informed by the Birchall court's statement that the standard it adopted is necessary to ensure "the level of certainty appropriate to justify civil contempt sanctions," which may be severe. Birchall, 454 Mass. at 852.

a. Privity. Relying on DeGiacomo v. Quincy, 476 Mass. 38 (2016), the judge ruled that "Boston Boat is in sufficient

---

[21] Boston Boat mistakenly cites to the now-superseded "clear and undoubted disobedience of a clear and unequivocal command" (emphasis added) standard that Birchall expressly rejected. Birchall, 454 Mass. at 852-853. Birchall not only raised the standard of proof from a preponderance of the evidence to clear and convincing evidence, it also discarded the "clear and undoubted disobedience" standard, thus "clarif[ying] that the disobedience must be clear, but need not be beyond doubt." Id. at 853.

'privity' with the parties against whom the injunctive relief was granted to be bound by those orders for contempt purposes." The judge stated that "[w]hile [DeGiacomo] discussed res judicata, its reasoning is equally applicable to contempt." This ruling was error insofar as it applied to a preliminary injunction.

The DeGiacomo court applied settled principles of issue preclusion, a doctrine premised on the existence of an earlier final judgment and operative against parties to that judgment and those in privity with them.  DeGiacomo, 476 Mass. at 42. Nothing in DeGiacomo suggests that a preliminary injunction applies to nonparties.[22]  Although a nonparty may be held in contempt for counseling, aiding, abetting, or otherwise acting in concert with a party in violating an order, see Bird v. Capital Site Mgmt. Co., 423 Mass. 172, 178-179 (1996) (violation of attachment order), there was no finding of any concerted activity here.  Nor has CWECA cited any case in which a nonparty has been held in contempt of a preliminary injunction based solely on its status as a successor in title to a party.

---

[22] We therefore need not decide whether the judge was correct in ruling that Boston Boat was in privity with the prior owners.

b. Judicial estoppel. The judge ruled in the alternative that judicial estoppel[23] required Boston Boat to obey the preliminary injunction. The judge found that Boston Boat had previously "represented . . . in open court, that it would abide by those restrictions and orders, with this court relying on that representation." Our review of this finding requires us to recount in some detail the proceedings that led to Boston Boat becoming a party to this case.

In 2010, after Boston Boat acquired the locus, CWECA moved to substitute Boston Boat for the prior owner of record as a defendant in this action. Boston Boat opposed the motion on the ground, among others, that it had no relationship with the prior owner and had not succeeded to any of its liabilities. With its opposition, Boston Boat filed the affidavit of its manager, stating that he was familiar with the recorded instruments containing the locus use restrictions and that Boston Boat had no intention of violating them.

CWECA's motion was the subject of two hearings, which focused in part on whether Boston Boat agreed to be bound not only (1) by the restrictions themselves, but also (2) by the

---

[23] "Judicial estoppel bars a party from asserting a position directly inconsistent with, meaning mutually exclusive of, the position asserted in a prior proceeding where the party convinced the court to accept its prior position." Bay State Gas Co. v. Department of Pub. Utils., 459 Mass. 807, 818 (2011).

judge's interpretations of them, as embodied in the 2006 preliminary injunction and the 2009 partial summary judgment ruling. At the first hearing, on July 23, 2010, the judge pressed Boston Boat on that question; in response, Boston Boat offered to submit a supplemental affidavit of its manager, agreeing to abide by those interpretations. The judge, seeking a more definitive end to the litigation, asked if Boston Boat would file a stipulation and agreement to judgment to that effect. Boston Boat declined to do so, expressing its opposition to becoming a party. The judge then stated his inclination to allow Boston Boat to be substituted as a defendant -- so as to "end this once and for all with a judgment that everybody recognizes as binding on the wharf" -- but asked Boston Boat and CWECA to try to agree on the terms of such a judgment.

At the September 8, 2010, hearing, the parties reported their inability to agree. The judge then noted Boston Boat's earlier statement that it was "willing to live with the restrictions," but observed that Boston Boat "may have hedged a bit" on whether it also agreed to abide by "[his] interpretation of the restrictions" and asked Boston Boat to clarify its position. In response, Boston Boat reiterated that it was aware of "the restrictions" and had no intent to violate them, but that, given the judge's expressed inclination "to substitute

Boston Boat into the case over [its] objection," Boston Boat would not simply agree to "a substitution and then an entry of judgment." Boston Boat was "not prepared to waive any rights to litigation[,] appeal or otherwise to lodge some valid objection or motion to the enforceability of those restrictions as they sit." The judge asked whether Boston Boat was seeking to preserve its appellate rights; Boston Boat replied that it would not waive "any rights, including [its] appellate rights," and that, "since it sounds like Boston Boat is coming into this case, [it] would like the opportunity to take part in some of the litigation that was missed in the last four years." The judge then took the motion to substitute under advisement.

Ten months later, CWECA filed its contempt complaint, asserting that Boston Boat was using the locus in violation of the 2006 preliminary injunction. The judge then issued an order stating that Boston Boat was not a party to this action, and that the motion to substitute Boston Boat as a defendant remained under advisement, but that in the meantime CWECA should move to amend its underlying complaint to add Boston Boat as a defendant. CWECA filed such a motion, which the judge allowed over Boston Boat's objection, and the 2011 trial on the underlying and contempt complaints ensued.

The judge's decision found with respect to judicial estoppel that Boston Boat had "stipulated that [it] would abide

by the restrictions <u>and the court's prior orders interpreting them</u>" (emphasis added), citing the transcript of the July 23, 2010, hearing.  The judge appears to have overlooked the later hearing of September 8, 2010, at which he himself had expressed uncertainty over whether Boston Boat had agreed to abide by "[his] interpretation of the restrictions," and had asked for clarification.  He also appears to have overlooked Boston Boat's carefully-worded reply -- that it had no intention of violating "the restrictions," but conspicuously omitting any mention of the judge's interpretation of them -- and its further clear statements that if it were going to be made a defendant over its objection, it would not agree to a judgment, would not waive "any rights," and wished to "take part in some of the litigation that was missed in the last four years."  These statements plainly indicated Boston Boat's intent to litigate further the validity and interpretation of the restrictions, despite prior interlocutory rulings on those issues that were adverse to its predecessors in title.

As reluctant as we are to hold a judge's finding about events in his own court room to be clearly erroneous, we are constrained to do so here.  "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  <u>Marlow</u> v. <u>New</u>

Bedford, 369 Mass. 501, 508 (1976), quoting from United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948). Here, the "entire evidence" includes the transcript of the September 8, 2010, hearing, which leaves us with the definite and firm conviction that Boston Boat did not agree to be bound by the judge's prior interpretations of the restrictions. To be sure, Boston Boat could have answered the judge's question more directly, by affirmatively stating its refusal to agree. We should not be misunderstood as condoning anything less than full and forthright answers to questions from the bench. But Boston Boat's implicit negative answer, coupled with its clear reservations of rights, compels us to reject the judge's finding that Boston Boat had agreed to be bound.

Here, an agreement to be bound was essential to the ultimate estoppel-based contempt finding. If Boston Boat was not bound, then either its later conduct was not "disobedience," or there was no "clear and unequivocal command" applicable to it in the first place. Either way, the contempt finding was not "supported by clear and convincing evidence of disobedience of a clear and unequivocal command." Birchall, 454 Mass. at 853. It lacked "the level of certainty appropriate to justify civil contempt sanctions," a serious matter. Id. at 852.

Conclusion. We affirm the judgment on the underlying complaint and reverse the order finding Boston Boat in contempt.

<u>So ordered</u>.